UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| PENNY J. POMILIA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:11-CV-15-PRC |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Penny J. Pomilia on January 12, 2011, and Plaintiff's Brief in Support of Reversal of Commissioner's Final Decision [DE 16], filed by Ms. Pomilia on May 6, 2011. Ms. Pomilia requests that the decision of the Administrative Law Judge denying her supplemental security income benefits be reversed or, alternatively, remanded for further proceedings. For the following reasons, the Court grants the request for remand.

## PROCEDURAL BACKGROUND

On July 27, 2007, Ms. Pomilia filed an application for supplemental security income ("SSI") benefits. Ms. Pomilia's application was denied, and she requested a hearing. A hearing was held on November 4, 2009, before Administrative Law Judge ("ALJ") Sherry Thompson. On January 14, 2010, the ALJ issued a decision finding Ms. Pomilia not disabled. The ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since July 9, 2007, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: chronic obstructive pulmonary disease; depression; alcohol dependence; and a history of drug abuse (20 CFR 416.920(c)).

3.      Based on objective medical evidence in the record and the DDS reviewers (Exhibit), I conclude that the claimant does not have an impairment or combination of impairments that meet or medically equal the requirements of any listed impairment in Appendix 1, Subpart P, Regulations No. 4, specifically when considered under Listings 3.02, 12.04, and 12.09 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, I find that the evidence of record as a whole supports a finding that the claimant retains the residual functional capacity to perform the exertional and nonexertional requirements of light work as defined in 20 CFR 416.967(b), frequently lifting and/or carrying 10 pounds; occasionally lifting and/or carrying 20 pounds; standing/walking, each for about 6 hours in an 8 hour workday; and sitting for at least 2 hours in an 8 hour workday.  Other limitations include frequent reaching with the right arm; occasional reaching with the left arm; and no concentrated exposure to fumes, odors, extreme heat, and extreme cold.  She can understand, remember, and carry out 1-2 step tasks; no work in close proximity to others in order to minimize distractions; normal interaction with supervisors, co-workers, and the general public; and she is also able to appropriately adjust to routine changes in the work environment.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on [], 1960 and was 47 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since July 9, 2007, the date the application was filed (20 CFR 416.920(g)).

(AR 11-18).

2

On November 8, 2010, the Appeals Council denied Ms. Pomilia's request for review of the ALJ's decision, leaving the ALJ's decision the final decision of the Commissioner.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A. Background

Ms. Pomilia was 49 years old on the date of the ALJ's decision.  She completed the eleventh grade in special education classes for math, English, spelling, speech, and reading.  She has no past relevant work experience.  On August 7, 2007, Ms. Pomilia reported on her disability claim form that she is able to shower, get dressed, make her bed, cook, dust, and do laundry but at a slower pace.  She indicated that she is unable to do yard work and occasionally goes grocery shopping.  She wrote that, if she vacuums, she has to rest every few minutes, and if she walks around the block, she has to rest at least five times for five minutes to catch her breath and rest her legs.

### B.  Medical History

*1.  Physical Health*

On her disability report form SSA-3368, Ms. Pomilia indicated that she has difficulty walking because of poor circulation in her legs, her legs ache all the time, and it is difficult for her to breath, especially when lying down.  On appeal, the disability report form SSA-3341 further indicates that she cannot stand very long because of pain in her legs.

On January 26, 2007, Ms. Pomilia reported a history of chronic obstructive pulmonary disease ("COPD") with emphysema, polysubstance abuse, and congestive heart failure. That date, she was admitted to St. Catherine's Hospital for complaints of shortness of breath and difficulty breathing. It was noted that she smoked about two and a half packs of cigarettes per day. She was diagnosed with acute exacerbation of COPD with emphysema, was treated, and was discharged on February 2, 2007.

On September 25, 2007, Dr. James Baumberger performed a consultative evaluation of Ms. Pomilia. Ms. Pomilia complained of shortness of breath and indicated difficulty walking one block. She also stated difficulty sleeping at night sometimes due to shortness of breath. She reported that she has numbness in her legs and fingers, but it was noted that a Doppler test of her legs for pain was negative. She denied wheezing or chest pain. She indicated that she has had congestive heart failure since 2002. Ms. Pomilia reported a diagnosis of diabetes from January 2007, and she stated that she has a prescription for insulin, but was not taking it. Ms. Pomilia told Dr. Baumberger that she was not presently using alcohol or illicit drugs. She reported that she is able to perform basic activities of daily living, and she can walk one block in five minutes before she feels short of breath. On examination, Ms. Pomilia ambulated with a normal gait that was not unsteady, lurching, or unpredictable; she was stable at station and appeared comfortable in the seated and supine positions. Her memory for recent and remote medical events was preserved, and her intellectual functioning was grossly normal.

On examination of the chest, Dr. Baumberger found symmetrical excursion, no increased A/P diameter, no accessory muscle use, and no chest wall tenderness to palpation. The lung fields were clear to auscultation and percussion without wheezes, rales, or rhonchi. There was slight

4

increased expiratory phase of respiration.  Spirometry testing revealed only mild airway obstruction.  On cardiovascular exam, Ms. Pomilia had regular rate and rhythm; S1 and S2 heart sounds were normal; and there was no apparent murmur, rub, or gallop.  Peripheral pulses were present and symmetrical.  There was no evidence of peripheral arterial insufficiency.  There was no clubbing or cyanosis, and there were no venous stasis changes such as pigmentation, ulceration, or brawny edema.  Ms. Pomilia was able to walk on her toes and heels and tandem walk; she could stand on either leg alone and could perform a 3/4 squat maneuver without difficulty.

Dr. Baumberger's impression were: 1) tobacco use, 1/2 pack per day cigarettes for over 36 years; 2) shortness of breath secondary to tobacco use; 3) COPD; 4) diabetes; 5) history of polysubstance abuse; and 6) skin cancer on the face, for which Ms. Pomilia indicated she was told to see a dermatologist.  Dr. Baumberger opined that Ms. Pomilia should be able to do light work in the work place.

On October 29, 2007, Ms. Pomilia went to Community Hospital after falling off her bicycle and injuring her left ankle and both shoulders, injuring the left shoulder more than the right.  An x-ray of the left ankle showed a fracture of the fibula.  X-rays of the shoulders were normal.  Louis Gluck, M.D. placed Ms. Pomilia in a short leg cast and prescribed Vicodin for pain; he ordered an MRI of the left shoulder, which showed edema of the humeral head.  Dr. Gluck indicated that her shoulder needed no specific treatment and would improve on its own.

On November 22, 2008, Ms. Pomilia arrived in the emergency room at Community Hospital complaining of chest pain, and she was admitted for further evaluation.  A physical examination showed her extremities were within normal limits.  There was no pedal edema, peripheral pulses were all present, her feet were warm, there were no signs of peripheral vascular disease, and there

was no cyanosis or clubbing.  On November 23, 2008, Vijay Shah, M.D., performed a cardiac examination, which revealed normal SI and S2 heart sounds.  There was no audible murmur.  Dr. Shah noted that Ms. Pomilia's alcohol level had been high when she came to the hospital.  He assessed chest pain, atypical for coronary artery disease, and he wanted to rule-out myocardial infarction, recommending an imaging stress test.

Ms. Pomilia underwent an Adenosine Stress Test on November 24, 2008.  The maximum predicted heart rate for her age was 170, and Ms. Pomilia attained an actual maximum heart rate of 120.  Other testing showed no reversible segmental ischemic changes and no segmental defects.  Left ventricular hypertrophy was noted.  There was decreased left ventricular ejection fraction at 49% and mild to moderate hypokinesis of the septum and basal inferior wall.

On August 21, 2009, Ms. Pomilia presented to the emergency room at St. Catherine Hospital.  Her friend stated that Ms. Pomilia had been confused off and on all day and had been having chest pain earlier.  At that time, Ms. Pomilia denied pain or shortness of breath.  On examination, she had regular heart rate and rhythm, and there was no murmur appreciated.  Her lungs were clear to auscultation.  A chest x-ray indicated emphysema and degenerative arthritis in the dorsal spine.  Ms. Pomilia admitted to drinking a lot of alcohol at bars the previous night.  She was discharged the same day in no acute distress.

On May 13, 2009, a medical note from M. Silverman, M.D. at the Highland Ridge Medical Center indicated a diagnosis of COPD, diabetes, chronic anxiety, and fibromyalgia.

The record contains treatment notes from Krishnan Potti, M.D., Ms. Pomilia's primary care physician, covering the period from December 2006 to September 2009.  The notes generally indicate that Ms. Pomilia complained of, among other things, backaches, headaches, and anxiety,

6

and Dr. Potti prescribed medication including Vicodin, Xanax, and Ambien. According to the notes, Ms. Pomilia stopped smoking in May 2009.

*2. Mental Health*

Ms. Pomilia received treatment at Southlake Center For Mental Health to address her substance abuse from June 14 to July 4, 2007. However, Ms. Pomilia did not successfully complete her treatment plan goals and decided to leave treatment prior to her discharge date against staff advice. Christina Pfeiffer, M.S., signed the discharge summary, noted a diagnosis of alcohol dependence, and assessed a Global Assessment of Functioning (GAF) score of 52. (AR 401).

On August 27, 2007, Joelle Larsen, Ph.D., a State Agency psychologist, reviewed the record evidence and opined that Ms. Pomilia did not have a severe mental impairment. Dr. Larsen considered Ms. Pomilia's recent treatment for polysubstance abuse and her allegation of sobriety for the past two months. Dr. Larsen opined that, with sobriety, Ms. Pomilia's mental condition was non-severe. On December 14, 2007, B. Randal Horton, Psy.D., a State Agency medical consultant, reviewed the evidence and affirmed Dr. Larsen's assessment.

On September 25, 2007, Irena M. Walters, Psy.D., a clinical psychologist, evaluated Ms. Pomilia. At that time, Ms. Pomilia reported she was able to groom, bathe, and dress herself. She reported that she cooked once a week, shopped once a month, or went on several small trips several times a month because of anxiety attacks and/or because of problems with her legs. Her household chores included making the bed, dusting, and doing dishes sometimes. She did laundry every few days and watched television all day. Ms. Pomilia stated that she was able to calculate change and manage money. She indicated her concentration was poor and perseverance fair. She did not get along with family but stated she got along with neighbors and with people generally. On mental

status examination, Ms. Pomilia was oriented to person, place, and time. She reported feelings of fatigue, loss of energy, loss of interest, tearfulness, helplessness, and hopelessness. Her mood was depressed, and her affect was appropriate. Her fund of information was fair. She was able to recall three out of three cities after seven minutes and repeat seven digits forward and three digits backward. She was able to perform some mathematical calculations such as: 3+5=8, 9-4=5, 2x8=16, and 14+17=31. Dr. Walters diagnosed depressive disorder, NOS; anxiety disorder, NOS; alcohol abuse; history of cocaine abuse, in remission; and history of marijuana use, in remission. She assessed a GAF score of 63. (AR 424).

On September 15, 2009, Ms. Pomilia was assessed at Regional Mental Health Center, on self referral. It was noted that she was trying to receive disability and that her attorney was trying to assist her in accessing treatment. Ms. Pomilia stated she does not drink as much as she used to, but she still drinks. At the assessment, Ms. Pomilia's mood was depressed, and her affect was sad. Her attention/concentration and judgment/reason were within normal limits. Her recent and immediate memory were impaired. Lauren Pellegrini-Hubster, a licensed social worker, diagnosed alcohol dependence; major depression, recurrent, moderate; anxiety disorder, NOS; and dependent personality disorder. She assessed a GAF of 50 (Tr. 564).

Ms. Pomilia was referred for individual psychotherapy, group psychotherapy, case management, and psychological assessment. She was to start individual therapy on November 4, 2009, to decrease her depressive symptoms. It was noted that Ms. Pomilia wanted psychological testing to aid in her disability case but did not want referrals to case management or group therapy at the time.

8

On December 10, 2009, Sarah Dross, Psy.D., evaluated Ms. Pomilia. Ms. Pomilia reported that she had completed 11th grade and part of 12th grade but did not from graduate high school, she was in special education classes, and her grades were below average. She stated she had difficulty with math and could not subtract double digit numbers. On mental status examination, Ms. Pomilia was alert and oriented to person, place, time, and situation. She was appropriately groomed and dressed well for the weather. She exhibited a full range of emotional expression with congruent affect. She did not evidence any hallucinations or delusions, and she exhibited clear and coherent thought processes. The WAIS-IV was administered, and Ms. Pomilia obtained a Full-Scale IQ score of 72, corresponding to the third percentile and within the borderline range of intellectual functioning. (AR 594). Dr. Dross noted that Ms. Pomilia had a lack of difficulty with performing normal daily living skills and evidenced the ability to perform tasks on her own such as cooking and cleaning; as a result, mild mental retardation was ruled out. Dr. Dross diagnosed major depressive disorder, recurrent moderate; anxiety disorder, NOS; borderline intellectual functioning; and alcohol dependence, unspecified. She assessed a GAF of 50. (AR 596).

### C. Ms. Pomilia's Testimony

At the November 4, 2009 hearing, Ms. Pomilia testified that she attended 11 grades of school in both regular and special education classes and that she sat in the hallway "a lot with one-on-one." (AR 27). Ms. Pomilia writes in a journal. She can read and write but has problems with math functions, including adding, subtracting, and multiplying. She testified that she cannot make change. Ms. Pomilia has been a housewife and mother all of her life. She tried to work at Pizza Hut, but only worked one day because she could not work the cash register.

Ms. Pomilia testified that she sees Dr. Potti, her treating physician, monthly for medication for her breathing problems of COPD and emphysema. She has a hard time breathing when she walks or is lying down so she sits in a lounge chair or reclines because it is easier to breathe. She has sought emergency room treatment many times for her breathing, and she has been admitted to the hospital for breathing problems. In the six months prior to the hearing, she had gone to the emergency room twice and, on both occasions, was stabilized and released. She testified that she had quit smoking six months prior to the hearing. She uses a nebulizer daily and had been doing so for a year and a half to two years. She also has an Albuterol inhaler but can no longer afford Advair.

Ms. Pomilia testified that she has problems with leg pain and tightness, testifying that her legs hurt constantly and that walking causes them to become tight and hurt. If she tries to do housework or walk she has to sit down and put her legs up by putting two pillows underneath them. She testified that her doctor told her that her leg tightness is related to lack of oxygen from the COPD. Her doctor instructed her to do exercises such as leg lifts and walking. Therefore, she walks five or six houses to the corner every day and back but then she has to sit down. If she stands for 30-40 minutes, her ankles, feet, and legs will hurt; squatting is very hard on her legs; and bending is difficult because it is hard to breathe. She testified that she has problems sleeping at night due to leg pain and sometimes she will be up for a couple of hours because of it. When asked by the ALJ, she testified that she can sit for 40 minutes in an hour if her legs are elevated with a couple of pillows.

Ms. Pomilia testified that she hurt her left shoulder in a fall and that it still hurts but not all of the time. She testified that she is able to do less overhead reaching with her left shoulder than with her right. Although she was not receiving any current treatment for her shoulder pain, she

10

testified that she takes Vicodin for the pain in her legs and shoulder. She stated that she experiences no side effects from the Vicodin. She testified that she experiences pain in her non-dominant left arm when she has breathing problems. She stated that she has no difficulty using her hands to grip items or write and that she is able to reach overhead with her right arm. She can lift a gallon of milk.

Regarding her social activities, Ms. Pomilia testified that she has no church or social activities and that she only goes out to the grocery store about once a week. She has no friends and does not like to be around people outside of her household.

Ms. Pomilia testified that she attended a substance abuse treatment program. She testified that she has anxiety and depression and that she would be starting therapy on November 12, 2007. She testified that she has been depressed for a long time and has problems with concentration and memory, causing her to watch the same TV shows without realizing it. Ms. Pomilia started seeing Lauren Pellegrino for drinking problems and now sees her for depression. Ms. Pomilia testified that she has problems focusing. Ms. Pomilia testified that she has put on a lot of weight in a short period of time and that she now weighs 170 pounds. She feels hopelessness, and she has thought about suicide but has never attempted it. She testified that she has gone to AA meetings. She has no funds of her own and is supported by her ex in-laws. Dr. Potti has prescribed both Vicodin and Xanax for Ms. Pomilia since September 2007.

### D. Vocational Expert Testimony

Richard Fisher, a vocational expert ("VE"), testified at the November 4, 2009 hearing. He testified that Ms. Pomilia has no past relevant work history. The ALJ asked the VE whether there would be any unskilled occupations for a hypothetical person of plaintiff's age, education, and work experience who could perform the full range of light work; could reach frequently with the right arm

11

but only occasionally with the left arm; must avoid concentrated exposure to fumes, odors, and extreme heat and cold; could understand, remember, and carry out one to two step tasks; must avoid working in close proximity to others to minimize distractions; can have normal interactions with supervisors, co-workers, and the public; and can adjust to routine changes in the work environment.

The VE replied that in Indiana there would be: 2,111 available cafeteria attendant (311. 677-010) jobs-light, SVP two; 3,300 deli cutter/slicer (316.684-014) jobs; and 25,058 cashier II (211.462-010) jobs-light, SVP two. The ALJ then asked the VE whether a person who, due to pain and difficulty concentrating, would be off task five percent of the time in addition to regularly scheduled breaks be able to do these jobs. The VE replied that, in an eight-hour work day, five percent added to the hour and fifteen minutes involved in regularly scheduled breaks would approximate 20 percent and that percentage would render the person not employable.

The VE also testified that, if a person gets short of breath after walking one block in five minutes, that would eliminate medium work and would restrict light work and that, if a person demonstrated an inability to give correct change, the cashier job would be eliminated. If the individual was able to perform only sedentary work with the same nonexertional limitations, the VE identified over 4,000 jobs as an office clerk, document preparer, hand feeler, telephone quote clerk, and order clerk. However, the jobs of office clerk, document preparer, and telephone quote clerk usually require a high school diploma. When asked by the attorney whether any of the jobs he identified involve fumes, the VE identified the cleaner positions under medium work.

The numbers that the VE provided about available jobs was for the State of Indiana, but he could not estimate what percentage of the jobs would be available in Lake County, Indiana. The VE stated that his testimony about jobs was consistent with the Dictionary of Occupational Titles

12

("DOT") and that his testimony about the number of jobs was based on his experience, knowledge, research, and information available in the DOT and other governmental sources.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

13

An ALJ must articulate, at a minimum, her analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to [her] conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

14

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are:  (1) Is the claimant engaged in substantial gainful activity?  If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to Step 2; (2) Does the claimant have an impairment or combination of impairments that are severe?  If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to Step 3; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to Step 4; (4) Can the claimant do the claimant's past relevant work?  If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to Step 5; (5) Can the claimant perform other work given the claimant's residual functional capacity, age, education, and experience?  If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At Steps 4 and 5, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC").  "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000.  The ALJ must assess the RFC based on all the relevant evidence of record.  *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)).  The claimant bears the burden of proving Steps 1 through 4, whereas the burden at Step 5 is on the ALJ.  *Id*. at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Ms. Pomilia makes several arguments for reversal or remand of the ALJ's decision.  The Court considers each in turn.

## A. Step 2 - Borderline Intellectual Functioning

On December 10, 2009, Dr. Dross diagnosed Ms. Pomilia with borderline intellectual functioning based on her Full-Scale IQ score of 72. Ms. Pomilia argues that the ALJ committed reversible error at Step 2 of the analysis by failing, without explanation, to find her borderline intellectual functioning to be a severe impairment. Ms. Pomilia cites a decision of the Eighth Circuit Court of Appeals holding that "[a] diagnosis of borderline intellectual functioning should be considered severe when the diagnosis is supported by sufficient medical evidence." *Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007) (citing *Hunt v. Massanari*, 250 F.3d 622, 625-26 (8th Cir. 2001)) (finding the ALJ erred by failing to find a diagnosis of borderline intellectual functioning to be a severe impairment). It appears that neither the Seventh Circuit Court of Appeals nor the district courts in the Seventh Circuit have directly addressed the issue.

In this case, however, any failure by the ALJ to identify borderline intellectual functioning as severe is harmless error. The ALJ found in Ms. Pomilia's favor at Step 2 based on the other severe impairments of COPD and depression and then later accounted for the borderline intellectual functioning through the subsequent steps of the sequential analysis in the RFC and the hypotheticals posed to the vocational expert. *Rinehart-Banaszak v. Comm'r of Soc. Sec.*, Cause No. 3:11-CV-12, 2011 WL 6826428, at *8 (N.D. Ind. Dec. 28, 2011) (recognizing that an ALJ's failure to designate an impairment as severe is harmless error when "the ALJ finds other severe impairments and continues with the five-step evaluation process"); *Hill v. Astrue*, No. 3:09-CV-00705, 2010 WL 3813258, at *13 (S.D. W. Va. Sept. 27, 2010) (finding harmless error when the ALJ did not find the claimant's borderline intellectual functioning to be a severe impairment when the RFC found the claimant "moderately limited in the ability to understand, remember and carry out detailed

instructions, but remains able to perform repetitive activities" and the ALJ's hypothetical to the VE

incorporated those limitations); *Raines v. Astrue*, No. 06-CV-0472, 2007 WL 1455890, *7 (S.D.

Ind. Apr. 23, 2007) ("As long as the ALJ proceeds beyond step two . . . no error could result solely

from his failure to label an impairment as 'severe.' . . . .  What matters is that the ALJ considers the

impact of all of the claimant's impairments–severe and non-severe–on his ability to work."); *Street*

*v. Barnhart*, 340 F. Supp. 2d 1289, 1293-94 (M.D. Ala. 2004) (explaining that the ALJ's failure to

list low IQ as severe impairment was harmless error when the ALJ referred to the claimant's

"borderline intellectual functioning" in his decision and considered plaintiff's "severe and not severe

impairments" in combination in subsequent analysis).

In this case, the ALJ referenced Dr. Dross' diagnosis of borderline intellectual functioning

and the Full-Scale IQ score of 72, which the ALJ recognized as corresponding with the 3rd

percentile and within the borderline range of intellectual functioning.  *See Terry v. Astrue*, 580 F.3d

471, 477 (7th Cir. 2009) (reversing because the ALJ ignored two of the claimant's impairments that

must be considered in the disability analysis when the ALJ failed to even mention the disorders,

underscoring that an "ALJ must consider the combined effects of all of the claimant's impairments,

even those that would not be considered severe in isolation.").  The ALJ then incorporated any

limitations resulting from Ms. Pomilia's borderline intellectual functioning by limiting her to work

involving one-to-two step tasks.

### B.  Step 3 - Listing of Impairments

At Step 3 of the disability evaluation process, the ALJ determines whether a disability

claimant's impairments meet or equal the criteria of a Listing of Impairments, and, if they do, the

claimant will be found disabled.  20 C.F.R. § 416.920(a)(4)(iii).  If a disability claimant suffers from

multiple impairments, the combined effect of all of her impairments must be considered to determine whether they are medically equivalent to a listed impairment. 20 C.F.R. § 416.923, 416.926(b)(3).

Having found that Ms. Pomilia has the severe impairments of COPD and depression, the ALJ considered Listings 3.02, 12.04, and 12.09 (20 CFR 416.920(d), 416.925, and 416.926). The ALJ found that Ms. Pomilia has no impairment or combination of impairments that meet or medically equal a listing.

*1. Borderline Intellectual Functioning*

Ms. Pomilia first objects that, although the ALJ acknowledged that Ms. Pomilia suffers from anxiety and depression, the ALJ did not consider all of her mental impairments because the ALJ failed to consider Dr. Dross' diagnosis of borderline intellectual functioning. However, Ms. Pomilia does not argue how the ALJ's determination would have changed or what Listing she medically equals based on borderline intellectual functioning in combination with her other severe impairments. Ms. Pomilia offers no argument, much less evidence, indicating how borderline intellectual functioning limits her beyond the limitations already incorporated in the RFC.

Notably, Ms. Pomilia does not argue that the ALJ's finding under Listing 12.04 for affective disorders would have changed or that the ALJ should have found her qualified under Listing 12.05 for mental retardation. To meet or equal a listed impairment, a claimant must satisfy all of the criteria of the listed impairment, and the claimant bears the burden of proving her condition meets or equals a listed impairment. *Maggard v. Apfel*, 167 F.3d 376, 379-80 (7th Cir. 1999). Ms. Pomilia has failed to show that the ALJ did not properly incorporate her borderline intellectual functioning at Step 3 of the analysis.

*2.  GAF Ratings*

Next, Ms. Pomilia argues that the ALJ ignored important evidence regarding the severity of her mental impairments by failing to discuss the four Global Assessment of Functioning ("GAF")'s assigned to her.  Four different mental health professionals who either examined or treated Ms. Pomilia rated her GAF: (1) on July 10, 2007, Christina L. Pfeiffer, MS gave her a GAF of 45 (AR 401); (2) on September 9, 2007, Irena M. Walters, Psy. D. gave her a GAF of 60 (AR 421-24); (3) on September 17, 2009, Lauren Pelligrini-Hubster, LESW, gave her a GAF of 50 (AR 564); and (4) on December 15, 2009, Sarah Dross, Psy.D. gave her a GAF of 50 (AR 596).  The ALJ did not discuss the GAF ratings in her decision.  Without articulating how the GAF ratings would have affected the Step 3 analysis, Ms. Pomilia simply argues that it was  clear error for the ALJ to ignore her low GAF ratings.

"[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score."  *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (quoting *Wilkins v. Barnhart*, 69 F. App'x 775, 780 (7th Cir. 2003)); *see also Walters v. Astrue*, 444 F. App'x 913, 919 (7th Cir. 2011).  A GAF rating is a measure of both the severity of symptoms and functional level.  *Id*.  "Because the final GAF rating always reflects the worse of the two, the score does not reflect the clinician's opinion of functional capacity."  *Id*. (internal quotation marks omitted) (quoting Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32-34 (Text Revision, 4th ed. 2000)).

In making the Step 3 determination, the ALJ considered the impairment-related functional limitations set forth in the B criteria of Listing 12.04 (affective disorders).  The ALJ recognized that to satisfy the B criteria, Ms. Pomilia's mental impairment must result in at least two of the

19

following: marked restriction of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. The ALJ then thoroughly considered each category and the evidence of record relative to each, finding that Ms. Pomilia had mild limitations in maintaining social functioning and in maintaining concentration, persistence, or pace, that she had moderate restriction of activities of daily living, and that she had no episodes of decompensation. Ms. Pomilia does not indicate how consideration of the various GAF ratings at this stage would affect the Listing analysis or that the ALJ otherwise erred in her analysis of the factors or evidence of record. The Court finds that the ALJ's determination that Ms. Pomilia did not meet or equal Listing 12.04 is supported by substantial evidence of record and that the ALJ did not err by omitting a discussion of the GAF scores from her decision. *See Fisher v. Astrue*, No. 1:06-CV-1741, 2007 WL 4150314, at *6 (S.D. Ind. Nov. 14, 2007) (finding that the ALJ did not err by not explicitly discussing the claimant's GAF scores because the GAF scale is not a diagnosis but is intended to be used to make treatment decisions and because neither the regulations nor case law require an ALJ to use a GAF score to determine the extent of disability).

The cases cited by Ms. Pomilia do not change this conclusion. In both *Punzio* and *Campbell*, the court discusses the GAF score in the context of the weight the ALJ gave to a treating physician's opinion. *See Punzio v. Astrue*, 630 F.3d 704, 711 (7th Cir. 2011) (discussing the internal consistency of the treating physician's records and recognizing that a GAF score of 60 was not inconsistent with an observation that the claimant's abilities to hold down an unskilled job would be "less than satisfactory"); *Campbell v. Astrue*, 627 F.3d 299, 306-07 (7th Cir. 2010) (finding that the ALJ failed to evaluate the entirety of a physician's report by focusing only on the portions

20

supporting a finding of non-disability while ignoring other portions that suggest a disability and concluding that "[a] GAF rating of 50 does not represent functioning within normal limits.  Nor does it support a conclusion that Campbell was mentally capable of sustaining work.").  In *Spiva*, a case involving a claimant who suffered from schizophrenia, the court noted that the ALJ ignored the claimant's GAF score of 20 as one of many facts of record that the ALJ ignored or misunderstood in the context of the ALJ's credibility determination.  *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010).  Again, Ms. Pomilia does not argue how the GAF scores would change the ALJ's analysis at Step 3 or otherwise contest the weight of the evidence relied on by the ALJ in assessing her mental impairments.

### 3.  *Opinion of Medical or Psychological Consultant*

Finally, Ms. Pomilia argues that the ALJ was required to consider the opinion of a defendant-designated medical or psychological consultant on the issue of whether the combination of Ms. Pomilia's impairments medically equal a listing, citing 20 C.F.R. § 416.926(c) and Social Security Ruling 96-6p.  The Regulation provides:

> What evidence do we consider when we determine if your impairment(s) medically equals a listing? When we determine if your impairment medically equals a listing, we consider all evidence in your case record about your impairment(s) and its effects on you that is relevant to this finding. We do not consider your vocational factors of age, education, and work experience (see, for example, § 416.960(c)(1)). We also consider the opinion given by one or more medical or psychological consultants designated by the Commissioner. (See § 416.1016.)

20 C.F.R. § 416.926(c).  Social Security Ruling 96-6p affirms the longstanding policy of the Social Security Administration regarding the consideration of findings of fact by State Agency medical and psychological consultants at the administrative level that "[a]n updated medical expert opinion must

be obtained by the administrative law judge or the Appeals Council before a decision of disability

based on medical equivalence can be made."  SSR 96-6p, 1996 WL 374180, *1,3 (July 2, 1996).

The Ruling further provides:

> The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) or SSA-832-U5 or SSA-833-U5 (Cessation or Continuance of Disability or Blindness) ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review. Other documents, including the Psychiatric Review Technique Form and various other documents on which medical and psychological consultants may record their findings, may also ensure that this opinion has been obtained at the first two levels of administrative review.

*Id*. at *3.  When an ALJ finds that a claimant's impairments do not medically equal any listing, the

requirement that the ALJ receive expert opinion into the record is satisfied by any of those listed

documents "signed by a State agency medical or psychological consultant."  *Id*.

On August 27, 2007, Dr. Larsen, a State Agency psychologist, completed a Psychiatric

Review Technique Form in which she considered Ms. Pomilia's mental impairments and opined that

Ms. Pomilia did not have a severe mental impairment, apparently based only on the impairment of

substance addiction disorders.  Although she could have marked a box indicating that Ms. Pomilia

meets or equals a listing, she did not.  In the section titled "Category(ies) Upon Which the Medical

Disposition is Based," Dr. Larsen checked only "12.09 Substance Addiction Disorders" and did not

check "12.04 Affective Disorders," "12.05 Mental Retardation," or "12.06 Anxiety-Related

Disorders."  (AR 405).  For the "B" Criteria of the Listings, Dr. Larsen rated Ms. Pomilia's degree

of functional limitation based on the listing of substance addiction disorder as mild in the category

of difficulties in maintaining concentration, persistence, or pace and rated her with no limitations

in the other three categories.  Dr. Larsen found no C criteria.  In her notes, Dr. Larsen wrote: "No

mental allegations. Recent treatment for polysubstance abuse. Only diagnosis give[sic] is substance abuse. Clmt alleges sobriety for past 2 months. No limitations reported on C12. Complaints are physical in nature. With sustained sobriety, clmt's mental condition is non-severe." On December 13, 2007, B. Randal Horton, Psy.D., a State Agency medical consultant, reviewed the evidence of record and the August 27, 2007 assessment and affirmed Dr. Larsen's opinion.

The Psychiatric Review Technique Form satisfies the requirement of the regulations and ruling for her mental impairments. However, in this case, Dr. Larsen evaluated Ms. Pomilia only as to her substance abuse and did not evaluate her for depression, the severe mental impairment identified by the ALJ. Therefore, the ALJ did not have the requisite "updated medical expert opinion" on the issue of Ms. Pomilia's mental limitations to assist in making a decision of disability based on medical equivalence. The ALJ should have arranged for a qualified expert to provide such an opinion. *See Barnett v. Barnhart*, 381 F.3d 664, 670-01 (7th Cir. 2004) (reversing on ALJ's equivalence determination because the ALJ never consulted a medical expert regarding whether the listing was equaled); *see also Richards v. Astrue*, 370 F. App'x 727, 731 (7th Cir. 2010) (finding no logical bridge from the evidence to the ALJ's assignment of a mild rating in each of the four categories in the absence of any medical professional rating the claimant's mental limitations in each area). Because the case is being remanded on this issue, the qualified medical expert shall also provide an opinion on equivalence as to Ms. Pomilia's borderline intellectual functioning diagnosed by Dr. Dross.

As for Ms. Pomilia's physical impairments, on October 22, 2007, Fernando R. Montoya, M.D., signed a Form SSA-416 providing an assessment of "not severe." Dr. Montoya wrote, "Review of evidence shows spirometry ids normal. despite her dx of chf. she is not on any treatment

for this and there is no objective signs of chf in the file." (AR 437). On December 13, 2007, B. Whitley, M.D. signed a Form SSA-416, affirming the assessment of October 22, 2007, based on a review of the evidence in the file. Dr. Whitley further wrote that "[R]ecent injuries from bike accident not expected to last 12 months." (AR 463). Although the ALJ references the DDS reviewers generally in her bolded summary of her Step 3 decision (AR 12) and in a generic paragraph describing the weight given to nontreating consultants, the ALJ does not identify or specifically reference the exhibits containing the DDS reviewers' opinions regarding Ms. Pomilia's physical health. These consultants did not offer an opinion on the medical equivalence issue, either as to her physical impairments individually or in combination with her mental impairments. The ALJ should have arranged for a consultant to provide a medical equivalence opinion. *See Martinez v. Astrue*, 630 F.3d 693, 697-98 (7th Cir. 2011) (faulting the ALJ for failing to consider the interaction of the claimant's many physical and mental problems, which in combination, might be totally disabling).

## C. Credibility

The Social Security Regulations provide that, in making a disability determination, the ALJ will consider a claimant's statement about her symptoms, including pain, and how they affect the claimant's daily life and ability to work. *See* 20 C.F.R. § 416.929(a). However, subjective allegations of disabling symptoms alone cannot support a finding of disability. *See id*. The Regulations establish a two-part test for determining whether complaints of pain or other symptoms contribute to a finding of disability: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the symptoms alleged; and (2) once an ALJ has found an impairment that

reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. *Id*.

The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)    The individual's daily activities;
(2)    Location, duration, frequency, and intensity of pain or other symptoms;
(3)    Precipitating and aggravating factors;
(4)    Type, dosage, effectiveness, and side effects of any medication;
(5)    Treatment, other than medication, for relief of pain or other symptoms;
(6)    Other measures taken to relieve pain or other symptoms;
(7)    Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3).  In making a credibility determination, Social Security Ruling 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence, the claimant's statement about symptoms, any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant, and any other relevant evidence. *See* SSR 96-7p, 1996 WL 374186, at *1 (Jul. 2, 1996).  Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on her ability to work "may not be disregarded solely because they are not substantiated by objective evidence."  SSR 96-7p, at *6; *see also* 20 C.F.R. § 416.929(c)(2).  An ALJ's credibility determination is entitled to substantial deference by a reviewing court and will not be overturned unless the claimant can show that the finding is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).  The ALJ's credibility determination, overall, must construct a "logical bridge" from the evidence to the conclusion. *See Myles v. Astrue*, 582 F.3d 672, 674 (7th Cir. 2009); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Ms. Pomilia argues that the ALJ's finding that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual capacity assessment," (AR 15), is an impermissible conclusory post-hoc statement. *See Brown v. Astrue*, No. 09-CV-249, 2010 WL 1727864, at *2 (S.D. Ill. Apr. 27, 2010); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003). The Seventh Circuit Court of Appeals has described this very language as "meaningless boilerplate." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

Ms. Pomilia contends that the ALJ impermissibly relied on the boilerplate language in lieu of thorough analysis, coming to a conclusion regarding Ms. Pomilia's RFC and then formulating a credibility finding based on the RFC. The Court disagrees, recognizing that the ALJ did provide an analysis of the evidence, including Ms. Pomilia's subjective allegations of her daily activities, the objective clinical and diagnostic findings as to each of her claimed disabilities (COPD, congestive heart failure, skin cancer on her face, diabetes mellitus, and depression), her noncompliance with medication, and the physician's opinions of record. *See* (AR 14-16).

However, an ALJ must explain *which* of a claimant's statements are not credible and the extent to which they are not credible. *See Martinez*, 630 F.3d at 696; *Spiva*, 628 F.3d at 348, 351. In this case, the ALJ did not identify which of Ms. Pomilia's statements are not credible and does not connect her analysis of the medical evidence and other evidence of record to the statements she finds not credible. For example, the ALJ found Ms. Pomilia capable of light work, including the ability to stand and walk for six hours in an eight-hour work day notwithstanding Ms. Pomilia's statements and testimony regarding her limited ability to stand and walk. If the ALJ found these

26

complaints by Ms. Pomilia not credible, the ALJ should have specifically stated so and why; the ALJ did not. On remand, the ALJ will have an opportunity to do so.

### D. Residual Functional Capacity

"Residual functional capacity" ("RFC") is a measure of what an individual can do despite the limitations imposed by her impairments. 20 C.F.R. § 416.945(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. § 416.927(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). The RFC is an issue at Steps 4 and 5 of the sequential evaluation process. SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996). "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.*

*1. Light Work - Sit/Stand*

Ms. Pomilia contends that the ALJ erred in finding her capable of light work, including the ability to stand and walk for about six hours in an eight-hour work day, given the record evidence of her limited ability to stand and walk due to breathing problems and pain. The record is replete with statements by Ms. Pomilia that she is limited in her ability to stand and walk due to her breathing problems and pain in her lower extremities. *See* (AR 146, 155, 170-72, 175, 190, 197, 200, 421, 423, 427). Ms. Pomilia testified at the hearing that, when she walks, she has a "hard time breathing, and [her] legs tighten up real bad," so much so that she must sit down and put her legs up for a while with two pillows underneath them. (AR 28). She also testified that, because her doctor has recommended that she walk short distances for exercise, she walks the distance of six houses to the corner of her block and back each day but that her legs hurt and get tight so that she has to sit down. Ms. Pomilia also testified that she is limited to standing for 30-40 minutes due to

27

pain in her ankles, feet, and legs.  As set forth in the previous section, because the ALJ did not identify which statements she did not find credible in light of specific evidence or testimony of record, the Court is unable to assess what weight the ALJ gave to these statements regarding Ms. Pomilia's functional limitations.

Ms. Pomilia also points to medical evidence in the record not identified by the ALJ.  First, she notes that, on September 25, 2007, Dr. Baumberger found that Ms. Pomilia has moderate patellofemoral syndrome of her left knee and that she has limited range of motion in her lumbosacral spine.  Although the ALJ found Dr. Baumberger's "opinion to be the most, informed, convincing, consistent with the medical evidence, and consistent with the record as a whole," and discussed several parts of Dr. Baumberger's report in detail, the ALJ did not identify his findings related to Ms. Pomilia's knee and spine.  In light of Ms. Pomilia's complaints of difficulty walking and standing, the ALJ should have discussed this favorable evidence in formulating the RFC.

Next, Ms. Pomilia argues that the ALJ erred in giving "great weight" to Dr. Baumberger's opinion that Ms. Pomilia is capable of performing "light work" because he examined Ms. Pomilia in September 2007, which was before she fell from her bike and more than two years before the ALJ's decision in January 2010, during which time additional medical evidence accumulated.  In contrast with Ms. Pomilia's assertion, the ALJ took into account the results of the arterial doppler in November 2008 (AR 15), discussing them at length.  However, the ALJ did not note that Ms. Pomilia complained to the doctor at that time that she is unable to exercise because of leg pain.  The ALJ did not specifically reference the chest x-ray in August 2009 that showed emphysema and degenerative arthritis in the dorsal spine but only generally characterized x-rays undergone by Ms. Pomilia as "unremarkable" without explanation.  (AR 15).  In addition, Ms. Pomilia had weight gain

28

from 141 pounds in September 2007 to 165 pounds in October 2009.  The ALJ does not discuss how these medical developments, which may have led to Ms. Pomilia's ability to stand and walk for long periods to deteriorate following Dr. Baumberger's examination in September 2007, may alter Dr. Baumberger's findings and, thus, the weight assigned to them.

Because the ALJ did not discuss these pieces of evidence, the Court cannot evaluate whether the ALJ considered them in evaluating Ms. Pomilia's RFC and finding that she can do the full range of light work.  On remand, the ALJ will have an opportunity to provide an adequate explanation of why she found Ms. Pomilia is able to stand and walk six of eight hours in a day in light of her testimony and the evidence of record, and to discuss the weight given to Dr. Baumberger's opinion in light of the medical evidence and Ms. Pomilia's statements subsequent to the September 2007 examination.[1]

*2.  Environmental Limitations*

In the RFC, the ALJ included an environmental limitation of avoiding concentrated exposure to fumes, odors, extreme heat, and extreme cold.  Ms. Pomilia argues that the ALJ cites no medical evidence to support what she describes as "such a mild environmental limitation in light of plaintiff's chronic obstructive pulmonary disease (COPD) and emphysema."  Pl. Br., p. 11.  She argues that medical science indicates that persons who suffer from COPD should avoid *any* inhaled irritants such as gases, fumes, and dust in the workplace as well as very cold or hot air temperatures.

---

[1] The Social Security Rulings prohibit an ALJ from assuming that a medical source's use of a term such as "light" indicates that the source is aware of the Social Security Administration's definition of the term. SSR 96-5p, 1996 WL 374183, *5 (July 2, 1996).  "The judgment regarding the extent to which an individual is able to perform exertional ranges of work goes beyond medical judgment regarding what an individual can still do and is a finding that may be dispositive of the issue of disability."  SSR 96-4p, at *5.  Nevertheless, "the adjudicator must . . . adopt in [the RFC] assessment any treating source opinion (i.e., opinion on the nature and severity of the individual's impairment(s)) to which the adjudicator has given controlling weight under the rules in . . . 416.927(d)(2)."  *Id*.

The Commissioner responds that Ms. Pomilia offers no evidence of record supporting greater environmental limitations than those found by the ALJ given the evidence of record regarding the limited severity of her COPD. The Commissioner also notes that Dr. Baumberger, who examined Ms. Pomilia and diagnosed COPD, did not indicate any environmental limitations. Because this case is being remanded on other issues, the Court directs the ALJ to provide an explanation in the decision on remand explaining the basis for the environmental limitations in the RFC.

### E. Step Five Determination

At Step 5 of the evaluation process, the ALJ found that Ms. Pomilia could perform light work jobs as a cashier (25,058), cafeteria attendant (2,111), and deli cutter-slicer (3,300). In so finding, the ALJ relied on the testimony of the VE. The Commissioner has the burden of proof at Step 5 to establish the existence of jobs that are within Ms. Pomilia's RFC. *See Kasarsky v. Barnahrt*, 335 F.3d 539, 543 (7th Cir. 2003).

*1. RFC for Performing One-Two Step Tasks*

The ALJ found that Ms. Pomilia is limited to understanding, remembering, and carrying out one-two step tasks. In the hypothetical questions posed to the VE, the ALJ included a limitation that "[s]he can understand, remember, and carry out one to two step tasks." (AR 51). Ms. Pomilia argues that each of the three jobs the VE identified in his testimony at the light work level involves more complexity than performing one- to two-step tasks.

The Dictionary of Occupational Titles ("DOT") assigns each job a General Educational Development ("GED") score, which "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance." Dep't of Labor, Dictionary of

Occupational Titles, App'x C(III), 1991 WL 688702 (G.P.O.) (4th ed., rev'd 1991).[2]  The GED scale

is composed of three divisions–reasoning development, mathematical development, and language

development.  *Id.*  Reasoning Development Level 1 provides: "Apply commonsense understanding

to carry out simple one- or two-step instructions.  Deal with standardized situations with occasional

or no variables in or from these situations encountered on the job."  *Id.*  Reasoning Development

Level 2 provides: "Apply commonsense understanding to carry out detailed but uninvolved written

or oral instructions.  Deal with problems involving a few concrete variables in or from standardized

situations."  *Id.*

     In *Terry v. Astrue*, the Seventh Circuit Court of Appeals found that the record in that case

supported the plaintiff's ability to perform jobs with a GED Reasoning Development Level 3

because the plaintiff had finished high school, had completed training to become a certified nurse's

assistant, and had the cognitive capacity to follow "simple instructions."  580 F.3d 471, 478 (7th Cir.

2009) (citing *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007)) (noting that in *Renfrow*, the

court found that a job requiring level three reasoning was not inconsistent with the claimant's ability

to follow only "simple, concrete instructions").  Other district courts in this circuit have analyzed

the relationship between "simple, unskilled work" and Reasoning Development Level 2 and have

found them not to be inconsistent.  *Thompkins v. Astrue*, No. 09 C 1339, 2010 WL 5071193, *10-11

(N.D. Ill. Dec. 6, 2010) (citing and discussing *Simms v. Astrue*, 599 F. Supp. 2d 988, 1007-08 (N.D.

Ind. 2009); *Masek v. Astrue*, No. 08 C 1277, 2010 WL 1050293, at *22 (N.D. Ill. Mar. 22, 2010);

*Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005); *Money v. Barnhart*, 91 F. App'x 210,

214 (3d Cir. 2004); *Flaherty v. Halter*, 182 F. Supp. 2d 824, 850-51 (D. Minn. 2001)); *see also*

---

[2] The Dictionary of Occupational Titles can also be found at http://www.occupationalinfo.org.

*Mattison v. Astrue*, No. 09-C-60, 2010 WL 446051, at *3 (E.D. Wis. Feb. 2, 2010) (recognizing the

holding in *Terry* and positing that, "under *Terry*, it may be that a limitation to 'simple, routine' work

is not inconsistent with reasoning level two."); *but see Sawyer v. Astrue*, No. 10 C 8019, 2011 WL

60101954, at *20 (N.D. Ill. Dec. 6, 2011) (distinguishing the holding in *Terry* regarding Reasoning

Level 3 positions not being inconsistent with a limitation to "simple, unskilled work").[3]

However, in this case, the ALJ did not limit Ms. Pomilia to "simple, unskilled work" but

rather limited her more specifically to the ability to understand, remember, and carry out one- to

two- step tasks.  *See Coleman v. Astrue*, No. CV 10-5641, 2011 WL 781930, *5-6 (C.D. Cal. Feb.

28, 2011) (recognizing a distinction between "simple, repetitive tasks or unskilled work" and

"one-to-two-step jobs").  This limitation was included in both the RFC and in the hypothetical to

the VE.  As noted above, Reasoning Development Level 1 expects the claimant to be able to

"[a]pply commonsense understanding to carry out simple one- or two-step instructions."  Each of

the three light jobs identified by the VE have a Reasoning Development Level of 2 or 3: cashier

(211.462-010) - Level 3; cafeteria attendant (311.677-101)- Level 2; deli cutter-slicer (316.684-014)

- Level 2.

Although the Seventh Circuit has not addressed the issue, several courts have concluded that

a limitation to one- to two-step tasks is consistent with GED Reasoning Development Level 1.  In

this case, the Court agrees as the language of Ms. Pomilia's limitation mirrors the language of Level

---

[3] The Commissioner argues in the response brief that it is inappropriate to compare RFC mental limitations to GED Reasoning Development Levels under the DOT because GED relates to the vocational factor of education, rather than the mental demands of a job set forth in an RFC.  This Court has already rejected that argument.  *See Simms v. Astrue*, 599 F. Supp. 2d 988, 1008 (N.D. Ind. 2009) (citing *Estrada v. Barnhart*, 417 F.Supp.2d 1299, 1302 n. 3 (M.D. Fla. 2006); *Mead*, No. Civ. 04-139, 2004 WL 2580744, *2 (Nov. 15, 2004); *Cooper v. Barnhart*, No. 03-CV-665-J, 2004 WL 2381515, at *4 (N.D. Okla. Oct. 15, 2004)); *see also Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (discussing the requirements of a GED reasoning score of three and whether the claimant was capable of performing the required skills, including noting that she had the cognitive capacity to follow simple instructions).

1. *See, e.g., Rodriguez v. Comm'r of Soc. Sec.*, No. 3:11-CV-398, 2012 WL 380275, *12-13 (N.D. Ohio Feb. 6, 2012) (finding that the ALJ failed to explain the contradiction between finding the claimant could perform jobs categorized as Reasoning Development Level 2 or 3 when the doctor to whom the ALJ had given substantial weight essentially limited the claimant to Reasoning Development Level 1 jobs because the doctor opined that the claimant was "markedly limited in his ability to understand and remember detailed instructions and his ability to carry out detailed instructions"); *Xai Lor v. Astrue*, No. 1:10-CV-01382, 2011 WL 3847153, *7 (E.D. Cal. Aug. 30, 2011) ("Notably, though a one to two-step instruction limitation would confine a worker to reasoning Level 1, a limitation to simple, repetitive work encompasses both Reasoning Levels 1 and 2."); *Grigsby v. Astrue*, No. EDCV 08-1413, 2010 WL 309013, *2 (C.D. Cal. Jan. 22, 2010) (finding the limitation to "simple repetitive tasks involving two steps of instruction . . . corresponds to the DOT definition of Level 1 reasoning"); *Segura v. Barnhart*, 148 F. App'x 707, 710-11, 2005 WL 2203237, *3 (10th Cir. 2005) (finding that the ALJ, who had limited the claimant to performing jobs requiring only the mental ability to understand, remember, and carry out one and two-step work instructions in jobs that are routine and repetitive in nature, had accounted for the mental limitations by finding that the claimant was limited to the first level of GED ratings); *see also Pharris v. Astrue*, No. 1:10-CV-01323, 2011 WL 3882508, *12 (E.D.Cal. Sept. 2, 2011) ("A limitation to three and four step instructions is consistent with jobs requiring Reasoning Level 2."); *But see George v. Astrue,* No. 10-00113-B, 2011 WL 4550131, *5 (S.D. Ala. Sept. 30, 2011) ("In this case, Plaintiff has failed to establish a conflict with respect to the reasoning levels because the children's attendant position has a reasoning level of 2, which is consistent with carrying out simple, one and two step tasks and instructions.").

The question then becomes whether the ALJ should have recognized the conflict between the testimony and the DOT at the hearing on the record in this case. Social Security Ruling 00-4p provides that, "[w]hen there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). The ALJ and the VE discussed the Specific Vocational Preparation ("SVP") classification for each of the three jobs; they did not discuss the GED reasoning level for each. In contrast with the GED categories, the SVP refers to the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dep't of Labor, Dictionary of Occupational Titles, App'x C(II), 1991 WL 688702. At the completion of the questioning, the ALJ inquired whether the VE's testimony about the identified jobs was consistent with the information in the DOT, and the VE answered in the affirmative.

The Seventh Circuit has held that an ALJ may rely on imperfect VE testimony if a claimant does not question the basis for the testimony at the time of the hearing. *Overman v. Astrue*, 546 F.3d 456, 455-56 (7th Cir. 2008) (citing *Donahue v. Barnhart*, 279 F.3d 441, 446-47 (7th Cir. 2002); *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004)). Although Ms. Pomilia's attorney questioned the VE on several issues at the hearing, the applicable GED reasoning level of the positions was not raised. Ms. Pomilia contends that the ALJ, as an experienced administrative law judge, should have recognized the "obvious conflict" between the RFC and the GED levels of the identified positions. *See Terry*, 580 F.3d at 478 (citing *Overman*, 580 F.3d at 463) ("Because Terry did not identify any conflict at the hearing, she would have to show that the conflict was 'obvious

enough that the ALJ should have picked up on [it] without any assistance.'"). The Court cannot say on this record that the conflict between Ms. Pomilia's limitation to one- to two-step tasks and jobs with a GED Reasoning Development Level 2 was so obvious that the ALJ should have picked up on the conflict without the assistance of counsel. Nevertheless, because there does appear to be a conflict and because the case is being remanded on other grounds, the ALJ is instructed to ask the VE about the conflict, if applicable.

*2. Math Skills*

Ms. Pomilia testified at the hearing that she has problems with math, including counting change. She adamantly stated that she cannot add, subtract, or multiply. (AR 27). She testified that she only worked one day at Pizza Hut because she could not work the cash register. *Id*. She also explained that she cannot count change because she cannot do the math. (AR 43). The report by Dr. Dross of psychological testing on December 10, 2009, indicated that Ms. Pomilia "exhibited a marked weakness in her ability to calculate math problems." (AR 595). The cashier job involves GED Level 2 skills in Mathematical Development, requiring the ability to add, subtract, multiply, and divide all units of measure, including with decimal fractions. (DOT, 183 and App. C, III, 1011). Moreover, the VE testified that if a person demonstrated the inability to give correct change, the person could not perform the cashier job. The evidence of record indicates that Ms. Pomilia does not possess the math skills necessary to perform the light work cashier job identified by the VE at the hearing. This conflict would have been obvious at the time of the hearing given Ms. Pomilia's testimony and the questioning of the VE, and the ALJ should have picked up on the potential for conflict and pursued the issue. On this record, the ALJ erred in finding that she could perform the cashier job.

35

*3. Reaching*

In the RFC, the ALJ found that Ms. Pomilia could reach frequently with her right arm but could only reach occasionally with her left arm. The descriptions in the DOT of the three light work jobs that the VE identified in his testimony require frequent reaching. Social Security Ruling 85-15 describes reaching as the ability to extend the hands and arms in any direction and further states that reaching ability is required in almost all jobs.

Ms. Pomilia argues that the ALJ erred in finding she could perform these jobs because of the limited ability to reach with her left arm. However, none of the job descriptions address whether frequent reaching with both upper extremities is required, and the ALJ's hypothetical specifically included a person who was limited to occasional reaching with the left arm. Because this matter is being remanded on other grounds, the ALJ shall clarify with the VE whether an RFC for reaching frequently with the right arm and only occasionally with the left arm would impact the ability to perform any identified positions.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the relief requested in Plaintiff's Brief in Support of Reversal of Commissioner's Final Decision [DE 16] and **REMANDS** this matter for further proceedings consistent with this opinion.

SO ORDERED this 2nd day of March, 2012.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record